**14-2078**

-------------------

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

-------------------------------

FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COOPERATIVE BANK,

*Plaintiff-Appellant,*

— v. —

RICHARD ALLEN RIPPY; JAMES D. HUNDLEY; FRANCES PETER FENSEL, JR; HORACE THOMPSON KING, III; FREDERICK WILLETS, III; DICKSON B. BRIDGER; PAUL G. BURTON; OTTIS RICHARD WRIGHT, JR; OTTO C. BUDDY BURRELL, JR..,

*Defendants-Appellees.*

-------------------------------

On Appeal from the United States District Court
for the Eastern District Of North Carolina in Case No. 7:11-cv-00165-BO

-------------------------------

## BRIEF OF *AMICI CURIAE* AMERICAN ASSOCIATION OF BANK DIRECTORS, INDEPENDENT COMMUNITY BANKERS OF AMERICA, AND THE CLEARING HOUSE ASSOCIATION, LLC, SUPPORTING APPELLEES

-------------------------------

Matthew P. Previn
Joseph J. Reilly
Ali M. Abugheida
BUCKLEY SANDLER LLP
1250 24th Street, NW, Suite 700
Washington, DC 20006
(202) 956-7500

*Attorneys for Amici Curiae American*
   *Association of Bank Directors, Independent*
   *Community Bankers of America, and The*
   *Clearing House Association L.L.C.*

February 6, 2015

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, amici curiae, American Association of Bank Directors ("AABD"), Independent Community Bankers' Association ("ICBA"), and The Clearing House Association L.L.C., make the following disclosures:

**AABD**:

1) Is amicus a publicly held corporation or other publicly held entity? NO

2) Does amicus have any parent corporations? NO

3) Is 10% or more of the stock of a amicus owned by a publicly held corporation or other publicly held entity? NO

4) Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))? NO

5) Does this case arise out of a bankruptcy proceeding? NO

**ICBA:**

1) Is amicus a publicly held corporation or other publicly held entity? NO

2) Does amicus have any parent corporations? NO

3) Is 10% or more of the stock of a amicus owned by a publicly held corporation or other publicly held entity?  NO

4) Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  NO

5) Does this case arise out of a bankruptcy proceeding?  NO

**The Clearing House Association L.L.C:**

1) Is amicus a publicly held corporation or other publicly held entity?  NO

2) Does amicus have any parent corporations?  NO

3) Is 10% or more of the stock of a amicus owned by a publicly held corporation or other publicly held entity?  NO

4) Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  NO

5) Does this case arise out of a bankruptcy proceeding?  NO

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF AMICI CURIAE ........................................................... 1

BACKGROUND .................................................................................. 4

ARGUMENT ........................................................................................ 5

    I.  The Policy Reasons for a Gross-Negligence Standard of Review
       in Private Damages Actions ........................................................ 6

           A.   Fairness and the Risk of "Hindsight Bias" in Assessing
               Business Decisions ........................................................... 7

           B.   The "Stupefying Disjunction" of That Risk vs. the Prospect
               of Individual Reward, Part I:  The Choice to Serve ........................ 10

           C.   The "Stupefying Disjunction," Part II:  For Directors and
               Officers Who Do Serve, the Chilling Effect of a Simple-
               Negligence Damages Standard Would Inhibit Economically
               Efficient Decision-making ........................................... 14

           D.   These Policies Apply Equally to Banks and Non-Banks ............... 16

II.   North Carolina Law – and the Delaware Cases It Follows – Provide for
       a Standard of Review Different from Simple Negligence .......................... 17

           A.   The Plain Text Calls for a Different Liability Standard ................. 18

           B.   Instructive Commentary Confirms the Divergence ....................... 20

           C.   Subsequent MBCA Revisions Make the Divergence Even
               More Clear ...................................................................... 21

           D.   The Legislative History of the Conduct Statutes Also Makes
               Plain that Their "No Liability" Clauses Do Not Impose
               Liability ........................................................................ 22

# TABLE OF CONTENTS
## *(Cont.)*

**Page**

    E.    The Conduct Standard Applies to Directors and Officers Via Public Supervision and Enforcement ...............................................23

CONCLUSION ..................................................................................... 26

CERTIFICATE OF COMPLIANCE ...................................................... 27

CERTIFICATE OF SERVICE ............................................................... 28

# TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Alford v. Shaw*,
      349 S.E.2d 41 (N.C. 1986) ............................................................................7

*Brehm v. Eisner*,
      746 A.2d 244, 264 (Del. 2000) ...................................................................4

*Dolphin and Bradbury, Inc. v. SEC*,
      512 F.3d 634 (D.C. Cir. 2008) ...................................................................8

*First Union Corp. v. SunTrust Banks, Inc.*,
      2001 WL 1885686 (N.C. Super. Ct., Aug. 10, 2001) ..............................5, 19

*Gagliardi v. TriFoods Int'l Inc.*,
      683 A.2d 1049 (Del. Ch. 1996) ............................................................12, 16

*Geitner v. Mullins*,
      643 S.E.2d 435 (N.C. Ct. Ap. 2007) ...........................................................20

*In re Citigroup Inc. S'holder Derivative Litig.*,
      964 A.2d 106 (Del. Ch. 2009) .....................................................................4

*In re Trados Inc. S'holder Litig.*,
      73 A.3d 17 (Del. Ch. 2013) ....................................................................6, 19

*Jones v. Whimper*,
      736 S.E.2d 170 (N.C. 2013) .......................................................................20

*Mieselman v. Mieselman*,
      307 S.E. 279 (N.C. 1983) .............................................................................5

*O'Melveny & Myers v. FDIC*,
      512 U.S. 79 (1994) .....................................................................................23

*Parsons v. Jefferson-Pilot Corp.*,
      426 S.E.2d 685 (N.C. 1993) .......................................................................20

**Page(s)**

*Quintal v. Greenstein*,
    256 N.Y.S. 462 (Sup. Ct.),
    *aff'd without opinion*, 257 N.Y.S. 1034 (1932) ...........................................23

*State v. Custard,*
    2010 WL 1035809 (N.C. Super. Ct. Mar. 19, 2010) .........................4, 18, 19

*Stewart v. BF Bolthouse Holdco, LLC*
    2013 WL 5210220 (Del. Ch. Aug. 30, 2013) ................................................12

*Stone ex rel. AmSouth Bancorporation v. Ritter*,
    911 A.2d 362 (Del. 2006) ............................................................................11

*Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship*,
    2007 WL 2570838 (N.C. Super. Ct. Mar. 5, 2007) ........................................7

*Washington Bancorporation v. Said*,
    812 F. Supp. 1256 (D.D.C. 1993) .................................................................13

*Yancey v. Lea*,
    550 S.E.2d 155, 158 (N.C. 2001) .................................................................12


**STATUTES AND STATUTORY MATERIAL**

12 U.S.C. § 1818(b) ...............................................................................................25

N.C.G.S. § 53-82 (2008) ........................................................................................19

N.C.G.S. § 53-94 (2008) ........................................................................................24

N.C.G.S. § 53-107.1 (2008) ...................................................................................24

N.C.G.S. § 53-119 (2008) ......................................................................................24

N.C.G.S. § 53-135 (2008) ................................................................................17, 24

**Page(s)**

N.C.G.S. § 55-8-30 ........................................................................... passim

N.C.G.S. § 55-8-42 ............................................................................. 17, 18

N.C.G.S. § 55-8-33 ............................................................................. 19, 23

N.C.G.S. § 55-35 (1957) ...............................................................................22

N.C. Session Laws 1989, c. 265, § 1 ............................................................22

N.C. Session Laws 1957 § 55-32...................................................................23

## LAW REVIEW ARTICLES

Christopher M. Bruner, *Good Faith, State of Mind, and the Outer
Boundaries of Director Liability in Corporate Law*,
41 Wake Forest L. Rev. 1131 (2006) ............................................................11

E. Norman Veasey & William E. Manning, *Codified Standard-Safe
Harbor or Unchartered Reef?*,
35 Bus. Law. 919 (Apr. 1980) ............................................................... 15, 16

Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. The
Business Judgment Rule: Differences in Hindsight Bias*,
73 Or. L. Rev. 587 (1994) ..............................................................................8

Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and
Standards of Review in Corporate Law*,
62 Ford. L. Rev. 437 (1993) .................................................................. passim

William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A
Reassessment of Standards of Review in Delaware Corporation Law*,
56 Bus. Law. 1287 (Aug. 2001) ............................................................. 6, 11

William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the
Standard of Review of Director Due Care with Delaware
Public Policy*,
96 Nw. U. L. Rev. 449 (2002) ............................................................... passim

**OTHER AUTHORITIES**

AABD, *AABD Survey Results - Measuring Bank Director Fear of Personal Liability* (Apr. 9, 2014) ...............................................................13

American Bar Association, *Report of Committee on Corporate Laws: Changes in the Model Business Corporation Act*, 30 Bus. Law. 501 (Jan. 1975) ......22

American Law Institute, PRINCIPLES OF CORPORTATE GOVERNANCE, § 4.01 (1994) ................................................. 16, 18

David Baris & Jared Kelly, FDIC DIRECTOR SUITS: LESSONS LEARNED (2012) ...........................................................10

FDIC, *Statement Concerning the Responsibilities of Bank Directors and Officers* (1992) ......................................................... 11, 17

FDIC, THE FDIC AND RTC EXPERIENCE: MANAGING THE CRISIS 275 (1998) ..........6

Federal Reserve Bank of Kansas City, BASICS FOR BANK DIRECTORS (5th ed. 2010) ...........................................................14

McLagan, *Today's Compensation Environment – 2012* (11th ed. Nov. 2012) ......................................................................13

Model Business Corporation Act § 8.30, Historical Background (2008) ...............21

Model Business Corporation Act § 8.31, Official Comments (2008) ....................21

Model Business Corporation Act § 35 (1969) (amended Sep. 1974) .....................22

Model Business Corporation Act § 48 (1969) ........................................................23

RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW (8th ed. 2011) ....................8, 14

Although this is a failed-bank case, the Federal Deposit Insurance Corporation's ("FDIC") principal position does not affect only failed banks. Rather, its position — that directors and officers with no conflicts of interest may be required to pay millions of dollars in damages on a hindsight showing of mere simple negligence — has significant implications for all banks, from the smallest community banks to the largest commercial banks. Correct application of the widely-accepted business judgment rule, which is a gross negligence standard, instead allows banks of all sizes to attract qualified individuals to serve as directors and officers and permits those individuals to make economically-efficient decisions. The FDIC's contrary position is inconsistent with North Carolina precedent, Delaware caselaw, and the policy rationale underlying the law.

## INTEREST OF AMICI CURIAE[1]

The American Association of Bank Directors ("AABD") is a non-profit organization that represents the interests of bank and savings institution directors throughout the Nation. Founded in 1989, AABD is the only trade group in the United States devoted solely to bank directors and their information, education, and advocacy needs.

---

[1] The parties to this appeal have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part. No one other than amici curiae, their members, or their counsel made any monetary contribution intended to fund the preparation or submission of this brief.

The Independent Community Bankers of America ("ICBA") is a nationwide trade organization dedicated to promoting and protecting the interests of community banks through monitoring of, and advocacy in, federal issues that affect thousands of community banks and their customers. The ICBA is the nation's voice for more than 6,500 community banks of all sizes and charter types and is dedicated exclusively to representing the interests of the community banking industry and its members.

Established in 1853, The Clearing House Association L.L.C. ("The Clearing House") is the oldest banking association and payments company in the United States. It is owned by the world's largest commercial banks, which collectively hold more than half of all U.S. deposits and which employ over one million people in the United States and more than two million people worldwide. The Clearing House is a nonpartisan advocacy organization that represents the interests of its owner banks by developing and promoting policies to support a safe, sound, and competitive banking system that serves customers and communities. Its affiliate, The Clearing House Payments Company L.L.C., which is regulated as a systemically important financial market utility, owns and operates payments technology infrastructure that provides safe and efficient payment, clearing and settlement services to financial institutions, and leads innovation and thought leadership activities for the next generation of payments. It clears almost $2

trillion each day, representing nearly half of all automated clearing house, funds transfer, and check-image payments made in the United States. *See* The Clearing House's web page at [www.theclearinghouse.org](www.theclearinghouse.org).

The threshold issue before this Court — whether bank directors and officers may be held financially liable for disinterested conduct based on a hindsight determination of mere ordinary negligence — is vitally important to every one of the amici's members, which range from the smallest community banks to the largest global financial institutions, and to the directors and officers of each. Amici are concerned that permitting such liability will have a chilling effect, both on the willingness of people to serve at their institutions and on the willingness of those who do serve to exercise their business judgment to make economically efficient, socially valuable decisions.

Amici ask this Court to hold, consistent with the well-settled business judgment rule and North Carolina law, that a hindsight determination of mere

simple negligence cannot trigger private damages liability for the outcome of good faith decisions not influenced by self-interest.[2]

## BACKGROUND

The FDIC's position is not based on any allegation of insider abuse, self-dealing, fraud, or a conflict of interest. The case, therefore, solely involves the standard of liability describing what a private plaintiff must show in hindsight to recover damages for an alleged breach of the duty of care. Despite the absence of any challenge to the defendants' loyalty, the damages sought by the FDIC here are substantial, ranging from $4 million to $33 million for each individual defendant. (JA 27-28.)[3]

---

[2]    The discussion herein regarding gross negligence is concerned only with the defendants' decision-making *process*, for as the Delaware Supreme Court has explained, the wisdom or "substantive" merits of a good faith decision itself is challengeable only under a standard more difficult for plaintiffs to satisfy than gross negligence — a test that asks only whether the decision can be attributed to any "rational business purpose." *Brehm v. Eisner*, 746 A.2d 244, 264 & n.66 (Del. 2000); *see State v. Custard,* 2010 WL 1035809, at *20 (N.C. Super. Ct. Mar. 19, 2010) (reflecting the same test). As one court more recently explained, the "business judgment rule is process oriented and informed by a deep respect for all *good faith* board decisions." *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 122 (Del. Ch. 2009) (citation omitted)).

[3]    "JA" cites refer to the parties' Joint Appendix.

# ARGUMENT

The FDIC's threshold contention is that it may recover damages based on a mere showing (in hindsight) of ordinary (or simple) negligence because that is the standard of *conduct* applicable to bank directors and officers in N.C.G.S. §§ 55-8-30 and -42, respectively (the "Conduct Statutes"). (*See* FDIC Brief ("Br.") at 25 & n.74, 29-30, 33-41.) As described in Part I below, compelling policy reasons counsel against the FDIC's position. And, as described in Part II, the Conduct Statutes do not, in fact, impose private damages liability for violating their standard of conduct. To the contrary, courts apply a different standard of *review*, gross negligence, for private damages liability. The appropriate "gross negligence" standard is one that is consistent with the policy interests described herein and required by both North Carolina precedent and caselaw in Delaware state courts, which North Carolina courts, as well as numerous other state courts, often follow in corporate matters.[4]

---

[4]     *E.g.*, *First Union Corp. v. SunTrust Banks, Inc.*, 2001 WL 1885686, at *8 (N.C. Super. Ct. Aug. 10, 2001) ("It is also true that the North Carolina courts have frequently looked to Delaware for guidance because of the special expertise and body of case law developed in the Delaware Chancery Court and the Delaware Supreme Court."); *Mieselman v. Mieselman*, 307 S.E. 279 (N.C. 1983).

## I. The Policy Reasons for a Gross-Negligence Standard of Review in Private Damages Actions

"The reasons" for the "pervasive divergence" between standards of conduct and of liability in duty-of-care cases "are rooted in policy interests."[5] Indeed, the FDIC itself implicitly acknowledges the wisdom of the policy arguments described below, at least for outside directors: the agency has had a "long-standing internal policy of pursuing only 'outside' director claims for which the facts show that the culpable conduct rises to the level of gross negligence or worse."[6] These same reasons also weigh in favor of making gross negligence the standard applicable to the FDIC's damages claims before the courts.

The policy reasons, in summary, address both the issue of fairness, and the indisputable disjunction, when a director or officer makes decisions, between (i) his risk of liability if the decision turns out badly and (ii) his individual reward if the decision turns out favorably. That disjunction can both deter directors and officers from serving and from making economically efficient, socially valuable decisions when they do serve. Without an appropriate standard of review, all bank

---

[5] William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295-96 (Aug. 2001) [hereinafter, "Allen, Jacobs & Strine, Jr., *Function Over Form*"]; *see In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013) (The "divergence [between the standards of conduct and liability] is warranted for diverse policy reasons typically cited as justifications for the business judgment rule.").

[6] FDIC, THE FDIC AND RTC EXPERIENCE: MANAGING THE CRISIS 275 (1998).

constituencies — customers, shareholders, employees, and the communities they serve — will suffer.  Further, the market will need to increase compensation to directors and officers and/or pay higher liability insurance premiums — with customers and shareholders ultimately footing the bill.

### A. Fairness and the Risk of "Hindsight Bias" in Assessing Business Decisions

North Carolina courts have long recognized that "corporate management should be accorded judicial deference under the business judgment doctrine," *Alford v. Shaw*, 349 S.E.2d 41, 50 (N.C. 1986), because "business decisions are best left in the hands of informed and experienced boards of directors and managers," *Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship*, 2007 WL 2570838, at *4 (N.C. Super. Ct. Mar. 5, 2007).  Stated so broadly, the rationale could apply as much to the standard of review for claims seeking prospective relief (such as one to stop a merger), but in fact it applies more strongly where, as here, the lawsuit is backward-looking.

Because the legal system is not perfect, any backward-looking assessment is subject to "hindsight bias."  Indeed, there "is empirical evidence that persons who know the outcome of a decision tend to exaggerate the extent to which that

outcome 'could have been correctly predicted beforehand.'"[7]  That is why, in

securities actions for instance, courts frequently caution against viewing the facts

in "the blazing light of hindsight."[8]  Moreover, anything less than a gross

negligence standard "create[s] a risk" arising from the inevitability of hindsight

bias "that legitimate conduct will be found to violate" the standard of conduct.[9]

These dangers of an unfair result are particularly acute in the case of business

decisions, such as the decision to extend a loan.  The reason why has been

explained by many experts, but we quote here Professor Eisenberg, the corporate-

law scholar selected by the American Law Institute to be the chief reporter for its

PRINCIPLES OF CORPORATE GOVERNANCE:

> In paradigm negligence cases involving relatively simple
> decisions, such as automobile accidents, there is often
> little difference between decisions that turn out badly and
> bad decisions.  In such cases, typically only one
> reasonable decision could have been made under a given
> set of circumstances, and decisions that turn out badly

---

[7]  William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy*, 96 Nw. U. L. Rev. 449, 454-55 (2002) [hereinafter, "Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*"] (quoting Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. The Business Judgment Rule: Differences in Hindsight Bias*, 73 Or. L. Rev. 587, 588 (1994)).

[8]  *E.g.*, *Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634, 642 n.9 (D.C. Cir. 2008).

[9]  Richard A. Posner, ECONOMIC ANALYSIS OF LAW 748 (8th ed. 2011) (describing the trade-offs between precise rules of conduct versus vague standards); *see also id.* at 749-50.

therefore almost inevitably turn out to have been bad decisions.[10]

Thus, in the case of most torts, there is no unfairness in conflating the standard of conduct (simple negligence) with the standard of review (whether the defendant was negligent). But as Professor Eisenberg has articulated, torts involving business decisions are different, because most reasonable business choices can nonetheless "turn out badly":

> … [i]n the case of business decisions it may often be difficult for factfinders to distinguish between bad decisions and proper [or at least non-negligent] decisions that turn out badly. Business judgments are necessarily made on the basis of incomplete information and in the face of obvious risks, so that typically a range of decisions is reasonable. A decision maker faced with uncertainty must make a judgment concerning the relevant probability distribution and must act on that judgment. If the decision maker makes a reasonable assessment of the probability distribution, and the outcome falls on the unlucky tail, the decision maker has not made a bad decision, because in any normal probability distribution some outcomes will inevitably fall on the unlucky tail.[11]

Under these circumstances, when in hindsight it is clear that the negative risk materialized, the *ex ante* decision was not necessarily "bad" (or "tortious," to

---

[10]     Melvin A. Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Ford. L. Rev. 437, 443 (1993); *see also* Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U. L. Rev. at 454.

[11]     Eisenberg, 62 Ford. L. Rev. at 444; *see also* Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U. L. Rev. at 454.

be more precise).  But if simple negligence were the standard of review, "factfinders might too often erroneously treat decisions that turned out badly as bad decisions, and unfairly hold directors and officers liable for such decisions."[12]

This problematic tendency of factfinders is especially applicable to the conduct most often at issue in FDIC lawsuits like this one:  the decision to make a loan.[13]  *Every* decision to extend credit involves risk and can turn out badly.  A gross-negligence standard of review addresses the problem of hindsight bias in evaluating business decisions by giving directors a larger "zone of protection to avoid an unfair imposition of liability."[14]

### B. The "Stupefying Disjunction" of That Risk vs. the Prospect of Individual Reward, Part I:  The Choice to Serve

Because of the danger of unfairness when evaluating directors' and officers' conduct on the basis of hindsight, it is widely recognized that a standard more demanding than simple negligence is needed to, in the words of the Delaware

---

[12]     *Id.*

[13]     Research by AABD demonstrates that most FDIC suits against directors often do in fact challenge the approval of individual loans.  *See* David Baris & Jared Kelly, FDIC DIRECTOR SUITS: LESSONS LEARNED (2012).

[14]     Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U. L. Rev. at 454-55; *see also* Eisenberg, 62 Ford. L. Rev. at 449 (A "gross-negligence standard of review" addresses this [unfairness] problem by "leaving a play in the joints in determining whether the relevant standard of conduct" *really* was violated.).

Supreme Court, "make[] board service by qualified persons more likely."[15]

Otherwise, "the risk of liability for assuming a given corporate role" would dwarf

"the incentives for assuming the role."[16] The same trade-off applies to bank

officers. Indeed, the FDIC itself, in its Policy Statement describing its program for

suing directors and officers, recognizes that "[b]anks need to be able to attract and

to retain experienced and conscientious directors and officers."[17]

Chancellor Allen, in a notable opinion, aptly used the term "stupefying" to

describe the disjunction that would exist between risk and reward for directors if

there were a simple-negligence standard. As he explained, if directors:

> were to be found liable for a corporate loss from a risky
> project on the ground that the investment was too risky

---

[15]   *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 372 (Del. 2006); Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U. L. Rev. at 449 ("If law-trained judges [or juries] are permitted to make after-the-fact judgments that business persons have made 'unreasonable' or 'negligent' business decisions for which they must respond in monetary damages, [then] [h]ighly qualified directors may also avoid service if they face liability risks that are disproportionate to the benefits of service.").

[16]   Eisenberg, 62 Ford. L. Rev. at 438; *see also* Allen, Jacobs & Strine, Jr., *Function Over Form*, 56 Bus. Law. at 1296 ("[G]iven the limited investment in publicly held firms that typical corporate directors are able or willing to make, any risk of liability would likely dwarf the incentives for assuming the role."); Christopher M. Bruner, *Good Faith, State of Mind, and the Outer Boundaries of Director Liability in Corporate Law*, 41 Wake Forest L. Rev. 1131, 1132 (2006) ("Directors bear the downside costs of potential personal liability, but only see a very small portion of any upside flowing from the risks they direct the business to take.").

[17]   FDIC, *Statement Concerning the Responsibilities of Bank Directors and Officers* (1992), *at* http://www.fdic.gov/regulations/laws/rules/5000-3300.html.

(foolishly risky! stupidly risky! egregiously risky!-you supply the adverb), their liability would be joint and several for the whole loss (with I suppose a right of contribution).  Given the scale of operation of modern public corporations, this *stupefying disjunction* between risk and reward for corporate directors threatens undesirable effects.[18]

Indeed, the disjunction exists even now, due in part to the FDIC's approach to cases like the one before this Court.  In a survey released by AABD last year, 24% of responding banks reported that fear of personal liability was a reason why either a director had resigned, a person offered a directorship had refused to serve,

---

[18]  *Gagliardi v. TriFoods Int'l Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996) (emphasis added).  For these reasons, the gross negligence standard under both North Carolina and Delaware law is "extremely stringent," *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 651-52 (Del. Ch. 2008), making the "difference between" ordinary and gross negligence "substantial," *Yancey v. Lea*, 550 S.E.2d 155, 158 (N.C. 2001).  The standard requires a showing of "conscious or reckless disregard." *Id.* at 157; *see Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *10 (Del. Ch. Aug. 30, 2013) ("Delaware's current understanding of gross negligence is conduct that constitutes reckless indifference or actions that are without the bounds of reason."); *see also* Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U.L. Rev. at 453 ("[I]n corporate cases, Delaware courts have chosen a definition of gross negligence that is even more difficult for a plaintiff to establish than the gross negligence standard normally applied in American tort or criminal cases.").

and/or a director had refused to serve on (or had resigned from) the board's loan committee.[19]

The disjunction between individual risk versus reward is well-illustrated by the dollar figures at issue in this case. The FDIC seeks between $4 million and $33 million from each individual defendant. (J.A. 27-29.) These figures contrast sharply with what bank directors like defendants, who served at a community bank, may expect in compensation. The median compensation of board members of banks with between $1 billion and $5 billion in assets, for example, is about $40,819; for banks between $500 million and $1 billion in size, it is about $26,646.[20]

Moreover, the bulk of outside directors at the type of institution at issue in this case — a community bank — serve not for the money but in order to aid their

---

[19] AABD, *AABD Survey Results - Measuring Bank Director Fear of Personal Liability* at 1 (Apr. 9, 2014), http://aabd.org/aabd-survey-results-measuring-bank-director-fear-personal-liability-good-news/; *see also Washington Bancorporation v. Said*, 812 F. Supp. 1256, 1267-68 (D.D.C. 1993) (noting, in lawsuit by FDIC against officers and directors: "Courts recognize that even disinterested, well-intentioned, informed directors can make decisions that, in hindsight, were improvident. To impose liability on directors for these good-faith business decisions, however, would effectively destroy the corporate system in this country, for no individuals would serve as officers and directors."). AABD sent its survey questionnaire to more than 2,000 randomly selected banks and savings institutions. Eighty institutions responded.

[20] McLagan, *Today's Compensation Environment – 2012* (11th ed. Nov. 2012) at 12, http://aabd.org/wp-content/uploads/2014/05/12-10-30-McLagan-White-Paper-final.pdf . This figure is based on an analysis of compensation data reported in proxy statements from 678 publicly traded banking institutions for the fiscal year 2011. *Id.* at 4.

communities by ensuring that deserving small business and other consumers have

adequate access to credit. It will not take much to convince such a director that the

risk of liability exceeds the rewards.[21]

### C. The "Stupefying Disjunction," Part II: For Directors and Officers Who Do Serve, the Chilling Effect of a Simple-Negligence Damages Standard Would Inhibit Economically Efficient Decision-making

When a liability standard is as broad as simple negligence, those subject to it

will not merely avoid stepping over the line it seeks to draw. Instead, given the

greater probability of a finding of error resulting in legal liability when assessing

compliance with such a broad standard, they will steer well clear of that line,

making decisions more conservatively than the standard may actually require.[22]

Here, where the risk of error is exacerbated by hindsight bias in making backward-

---

[21]   *See, e.g.*, Federal Reserve Bank of Kansas City, BASICS FOR BANK DIRECTORS vii (5th ed. 2010) ("'Why serve as an outside bank director?' The answer is that banks play an important role in the economic lives of their communities. As a director, you can have influence over and help shape your local economy. … You may be asked to serve for a variety of reasons, including your business expertise or prominence in your community. Whatever the reason, your invitation to serve is testimony to the valuable contribution the bank's shareholders believe you can provide to its management.").

[22]   Posner, ECONOMIC ANALYSIS OF LAW 749 (explaining that because of the risk of legal error, a relatively vague law necessarily "deter[s] some legitimate activities" (referencing *id.* at 299 (explaining that the application of sanctions to non-intentional conduct "and *a fortiori* to unavoidable conduct" creates "incentives to steer clear of lawful activity in order to avoid the risk of erroneous" punishment))).

looking judgments of business decisions, the chilling effect on decision-making would be even more pronounced.

A standard of review more appropriate and reasonable for directors and officers than simple negligence is therefore necessary to avoid unduly deterring officers and directors from making the most economically efficient, socially valuable choices.[23]  If they are unduly conservative in their decision-making, the benefits of efficiency cannot be fully realized.  As former Chief Justice Veasey put the matter, "to equate the analyses in common negligence cases with those involving corporate decision-making overlooks the different values society assigns to the behavior under review."[24]  While there is "no discernible basis, in common negligence cases, to encourage [a pedestrian] to risk crossing the street," for

---

[23]   Allen, Jacobs & Strine, Jr., *Realigning the Standard of Review*, 96 Nw. U. L. Rev. at 454 ("If a high-risk decision leads to a good outcome, only the corporation (but not the directors) would benefit, whereas a bad outcome could cause the directors to be held liable for the corporation's entire loss.").

[24]   E. Norman Veasey & William E. Manning, *Codified Standard-Safe Harbor or Unchartered Reef?*, 35 Bus. Law. 919, 931-32 (Apr. 1980).

example, courts "have traditionally favored freedom in corporate decision-making in response to society's encouragement of risk-taking enterprises."[25]

If a simple-negligence standard applies, companies would likely have to address the effects noted above — a disincentive to serve and a chilling effect on making the most economically efficient decisions — by increasing compensation to directors and officers and/or by paying higher liability insurance premiums.

## D.     These Policies Apply Equally to Banks and Non-Banks

The FDIC is mistaken in characterizing "*bank* directors and officers" as subject to a "heightened standard of care" versus their corporate counterparts. (FDIC Br. at 36-37 (emphasis in original).)  No modern-era North Carolina case so holds, because the view is "unjustified and anachronistic today."[26]  The modern view is that "[n]o sensible distinction can be drawn solely on the basis of the label 'financial' as opposed to 'industrial' corporation."[27]  In any event, the question that matters is whether the *North Carolina legislature* specified divergent standards for

---

[25]     *Id*.  Professor Eisenberg also has provided a nice example of how a simple-negligence standard's over-deterrence of risky decisions would be harmful.  *See* Eisenberg, 62 Ford. L. Rev. at 445; *see also Gagliardi*, 683 A.2d at 1052 ("But directors will tend to deviate from this rational acceptance of corporate risk *if*, in authorizing the corporation to undertake a risky investment, the directors must assume some degree of personal risk relating to *ex post facto* claims of derivative liability for any resulting corporate loss.").

[26]     American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE § 4.01, Reporter's Note ¶ 18 (1994).

[27]     *Id.*

banks versus non-banks, and it did not. *See* § N.C.G.S. 53-135 (2008)[28] ("All provisions of the law relating to private corporations" — including those concerning bank directors and officers — "not inconsistent with this Chapter or with the business of banking, shall be applicable to banks.").

The "banks-are-different" argument, moreover, is inconsistent with the FDIC's landmark 1992 Policy Statement, still in effect, regarding its professional liability program. The purpose of the Policy Statement was to assure the banking community in the wake of the S&L crisis that the program would be based on widely familiar, corporate-law principles of director-and-officer liability.[29]

## II. North Carolina Law – and the Delaware Cases It Follows – Provide for a Standard of Review Different From Simple Negligence

As shown below, the FDIC's contention that North Carolina's Conduct Statutes (N.C.G.S. §§ 55-8-30 and -42) codify a simple negligence standard of liability is not correct.

---

[28]    In 2012, the North Carolina General Assembly moved some banking-law statutes from Chapter 50 to new Chapter 53C of the state code and amended the statutes in immaterial ways. Amici cite to the Chapter 50 version of 2008 rather than the current, Chapter 53C version of those statutes, because the conduct alleged in the FDIC's complaint took place from 2006 to 2008.

[29]    FDIC, *Statement Concerning the Responsibilities of Bank Directors and Officers* (1992), *at* http://www.fdic.gov/regulations/laws/rules/5000-3300.html ("Similar to the responsibilities owed by directors and officers of all business corporations, these [bank-director] duties include the duties of loyalty and care.").

## A. The Plain Text Calls for a Different Liability Standard

While the two Conduct Statutes for directors and officers outline the general standard of care (*i.e.*, the care of "an ordinarily prudent person") and provide immunity from liability (*i.e.*, "is not liable") under certain circumstances, they nowhere describe when a director is, in fact, liable for breach of the duty of care. The Conduct Statutes, in other words, merely identify the standard of *conduct* for directors and officers. *See* § 55-8-30 official cmt. ("Section 8.30 defines the general *standard of conduct* for directors. …") (emphasis added); § 55-8-42 official cmt. ("The Official Comment to section 8.30 is generally applicable to nondirector officers as well as to directors.").

But there is a difference between the standard of conduct expected of directors and the business judgment rule, which is the standard of *liability* (or review) that determines whether directors will be held liable in damages for a decision that yielded negative results. As explained by the chief reporter for the American Law Institute's PRINCIPLES OF CORPORATE GOVERNANCE, the standards of conduct and liability, or review, for directors and officers "'pervasively diverge.'"[30]

---

[30]  *State v. Custard,* 2010 WL 1035809, at *15 (N.C. Super. Ct. Mar. 19, 2010) (quoting Eisenberg, 62 Ford. L. Rev. at 438).

This difference is well-grounded in Delaware caselaw. *See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013) (The "divergence [between the standards of conduct and liability] is warranted for diverse policy reasons typically cited as justifications for the business judgment rule."). North Carolina courts also recognize this divergence in duty-of-care claims. *E.g., Custard,* 2010 WL 1035809, at *15 ("[S]tandards of review in corporate law diverge from standards of conduct when fairness and structural requirements dictate that such a divergence will promote corporate value or wealth creation."); *First Union Corp.,* 2001 WL 1885686, at *6.[31]

Moreover, the North Carolina legislature knows exactly how to create liability when it intends to do so. Indeed, an example appears in between the two Conduct Statutes. *See* N.C.G.S. § 55-8-33 ("A director who votes for or assents to [an unlawful distribution] *is personally liable to the corporation … .*" (emphasis added).) And for bank directors specifically, *see* N.C.G.S. § 53-82 (2008) ("Any director of any bank who shall knowingly violate or who shall knowingly permit to be violated by any officers, agents, or employees of such bank, any of the

---

[31]    Apart from the appropriate standard of review, defendant *directors* also are protected in damages actions by the statutorily authorized exculpatory clause in the bank's Articles of Incorporation, as defendants explain. *See* Redacted Brief of Appellees ("Defendants' Br.") at 56-59.

provisions of this Chapter *shall be held personally and individually liable* for all damages … ." (emphasis added)).

### B. Instructive Commentary Confirms the Divergence

The Official Comments to the Conduct Statutes (which come from the MODEL BUSINESS CORPORATION ACT ("MBCA"), on which the Conduct Statutes are based), also make plain that the laws were intentionally drafted in the negative — a director "shall have no liability" — so as to "le[ave] to the courts" the question of how the business judgment rule affects a director's liability under the general standard of care:[32]

> [S]ection 8.30 does not try to codify the business judgment rule or delineate the differences, if any, between that rule and the standards of director conduct set forth in this section.  That is a task left to the courts and possibly to later revisions of the Model Act.

N.C.G.S. § 55-8-30 official cmt.

North Carolina-specific commentary to the statutes confirms as much. Specifically, it notes that when the standard of liability is altered for directors via an exculpation provision in a bank's articles of incorporation, the standard of

---

[32]    North Carolina courts look to the Comments to the MBCA in interpreting provisions based on the Model Act.  *Geitner v. Mullins*, 643 S.E.2d 435, 442 (N.C. Ct. Ap. 2007) (explaining that the court "can conceive of no reason to apply a different interpretation [than that expressed in the comments to the Model Act] … especially when the General Assembly would have been fully aware of the Model Act's commentary when enacting our Business Corporation Act"); *see also Parsons v. Jefferson-Pilot Corp.*, 426 S.E.2d 685, 689 (N.C. 1993); *Jones v. Whimper*, 736 S.E.2d 170, 171-72 (N.C. 2013).

*conduct* remains in place. N.C.G.S. § 55-8-30 N.C. cmt. ("[A] provision in the articles of incorporation that limits director's monetary liability for a breach of the duty of due care does not affect the duty of due care itself.").

    **C.    Subsequent MBCA Revisions Make the Divergence Even More Clear**

    The current version of the MBCA carries forward and clarifies this "distinction between standards of conduct and standards of liability." MBCA § 8.31, Official Comments (2008). It adds the title "Standard of Care for Directors" to Section 8.30 and adds a new separate section (Section 8.31) entitled "Standard of Liability for Directors," which codifies the business judgment rule, and explains in the Comments that a director's failure to satisfy the standard of care "does not automatically establish personal liability for damages." *Id.* The Comments leave no doubt that the drafters intended the adopting States to leave room for the business judgment rule under Section 8.30 and its similarly-worded predecessor, Section 35:

> Notwithstanding clear statements to the contrary in the Official Comment to former section 8.30, some courts interpreted section 8.30 or statutes modeled on it as establishing a negligence test for director liability. These decisions … blurr[ed] the relationship between the statutory 'duty of care' and the common law business judgment rule[.]

MBCA § 8.30, Historical Background (2008).

**D.    The Legislative History of the Conduct Statutes Also Makes Plain that Their "No Liability" Clauses Do Not Impose Liability**

The FDIC's position (*see* FDIC Br. at 25 & n.74, 36, 41) relies heavily on subsection (d) (the "No Liability" clause) of each of the Conduct Statutes, which provide that a director or officer "is not liable for any action taken as a [director or officer], or any failure to take such action, if he performed the duties of his office in compliance with" their standard of conduct.  The FDIC takes the No Liability clauses sentence to mean that they *create* liability in damages for any conduct short of the Conduct Statutes' standard.  *E.g.*, FDIC Br. at 41 ("Allowing a business judgment rule to effectively elevate the standard of care to gross negligence impermissibly rewrites the statute[.]").  The legislative history helps show why the FDIC's assertion is wrong.

The Conduct Statutes' predecessor, like its MBCA counterpart, did not reference "liability" at all.  It merely described the standard of conduct.[33]  The "No Liability" clause was added more recently, but not to *impose* liability for violating the standard of conduct.[34]  To the contrary, the purpose of inserting the No Liability clause was to immunize directors against strict liability claims for

---

[33]    N.C.G.S. § 55-35 (1957); MBCA § 35, ¶ 2 (1969) (amended Sep. 1974), *reprinted in* American Bar Association, *Report of Committee on Corporate Laws: Changes in the Model Business Corporation Act*, 30 Bus. Law. 501, 502 (Jan. 1975).

[34]    N.C. Session Laws 1989, c. 265, § 1; MBCA § 35, ¶ 2 (1969) (amended Sep. 1974).

violating other law — such as the bar on unlawful distributions.  Inserting the "No

Liability" sentence into the provision provided directors with the general defense

of due care, in addition to pre-existing defenses based on reliance on specified

types of information.[35]  North Carolina's modern prohibition on unlawful

distributions carries forward the cross-reference to the Conduct Statutes' No

Liability clause.  N.C.G.S. § 55-8-33(a) (requiring plaintiffs alleging unlawful

distributions to also show that the director "did not perform his duties in

compliance with G.S. 55-8-30," *i.e.*, the statute applicable to directors.).

### E.    The Conduct Standard Applies to Directors and Officers Via Public Supervision and Enforcement

The FDIC also misses the mark in claiming the statutory standard of conduct

would be meaningless if private plaintiffs, like it, could not recover damages for

hindsight determinations of ordinary negligence.  (FDIC Br. at 33–34, 39.)  (The

FDIC suing as a receiver is for all relevant purposes a private plaintiff.[36])  The

North Carolina legislature, in fact, has provided for potent enforcement of the

conduct standard against bank directors and officers, but chose to vest the power to

---

[35]    As commentary to MBCA § 48 (1969) had explained, some unlawful distribution statutes, like North Carolina's, *see* N.C. Session Laws 1957 § 55-32, provided no general defense to liability for due care.  And caselaw construing the prohibitions on unlawful distributions had refused to allow the defense.  MBCA § 48 casenotes (1969) (describing *Quintal v. Greenstein*, 256 N.Y.S. 462 (Sup. Ct.), *aff'd without opinion*, 257 N.Y.S. 1034 (1932)).

[36]    *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 85-89 (1994).

enforce that standard in a state agency, rather than private plaintiffs — a choice consistent with all the policy reasons detailed in Part I, above. That legislative choice should be respected.

Specifically, the North Carolina Commissioner of Banks ("Commissioner") may issue cease-and-desist orders when the conduct standard has been violated by a director or officer.[37] Failure to comply with the order carries a penalty of up to $500 per day.[38] The Commissioner can also seek removal of any director or officer who "persistently" violates the conduct standard.[39] In addition, a North Carolina-chartered bank's federal supervisor (either the Federal Reserve or, in its supervisory capacity, the FDIC) may commence cease-and-desist proceedings

---

[37]     N.C.G.S. § 53-107.1 (2008) (providing that "the Commissioner shall have the power to … Order any … director [or] officer … to cease and desist violating any provision of this Chapter"). This "Chapter" referred to Chapter 53, "Regulation of Financial Services," § 53-135 (2008) of which provided that "[a]ll provisions of the law relating to private corporations" — such as the Conduct Statutes providing the standard of conduct for directors and officers — "not inconsistent with this Chapter or with the business of banking, shall be applicable to banks." *See also* N.C.G.S. § 53-94 (2008) (Commissioner "is empowered to sue and prosecute … for the enforcement or protection of any right or pursuit of any remedy necessary or proper in connection with the subjects committed to him for administration or in connection with any bank … under his supervision").

[38]     N.C.G.S. § 53-107.1(d) (2008).

[39]     N.C.G.S. § 53-119 (2008) (The Commissioner "shall have the right, and is hereby empowered, to require the immediate removal from office of any officer, director, or employee of any bank … who persistently violates the laws of this State.").

against directors or officers for violating any "law," including the Conduct Statutes.[40]

Accordingly, there is no reason as a matter of North Carolina law to disregard the well-settled business judgment rule and turn the Conduct Statutes' standard of conduct into a standard of private damages liability, because that conduct standard is enforceable through several other mechanisms.

---

[40]    12 U.S.C. § 1818(b).

## CONCLUSION

For the reasons described above as well as those in the brief of Defendants, this Court should confirm that where only disinterested conduct by directors and officers is at issue, a plaintiff may not recover damages without proving gross negligence, as required by the business judgment rule and as defined by controlling precedent.

Respectfully submitted,

 s/ Matthew P. Previn
Matthew P. Previn
Joseph J. Reilly
Ali M. Abugheida
BUCKLEY SANDLER LLP
1250 24th Street, NW, Suite 700
Washington, DC  20006
(202) 956-7500

*Attorneys for Amici Curiae American Association of Bank Directors, Independent Community Bankers of America, and The Clearing House Association L.L.C.*

February 6, 2015

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [X] this brief contains [6,043] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [     ] this brief uses a monospaced typeface and contains [*state number of*] lines of text, excluding the parts of the brief excepted by Fed. R. App. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: <u>February 6, 2015</u>                    /s/ Matthew P. Previn
                                                        *Counsel for Amici*

# CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of February, 2015, I caused this Brief of
Amici to be filed electronically with the Clerk of the Court using the CM/ECF
System, which will send notice of such filing to the following registered CM/ECF
users:

Douglas A. Black
Mary L. Wolff
WOLFF ARDIS, P.C.
5810 Shelby Oaks Drive
Memphis, Tennessee 38134

Steven C. Morrison
James S. Watson
FEDERAL DEPOSIT INSURANCE CORPORATION
LEGAL DIVISION, APPELLATE UNIT
3501 North Fairfax Drive
Arlington, Virginia 22226
*Counsel for Appellant*

Thomas E. Gilbertsen
Ronald R. Glancz
Meredith L. Boylan
VENABLE, LLP
575 7th Street, N.W.
Washington, D.C. 20004

Camden R. Webb
WILLIAMS MULLEN
P.O. Box 1000
Raleigh, North Carolina 27602
*Counsel for Appellee*

/s/ Matthew P. Previn
*Counsel for Amici*